**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

MICHAEL RAYMOND THOMPSON, )
)
    Movant, )
)          Cv. No. 2:13-cv-02071-JPM-dkv
v. )          Cr. No. 2:08-cr-20397-JPM-dkv-2
)
UNITED STATES OF AMERICA, )
)
    Respondent. )

**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody ("§ 2255 Motion") filed by Movant, Michael Raymond

Thompson, Bureau of Prisons register number 22589-076, who is currently incarcerated at the

United States Penitentiary in Atlanta, Georgia. (§ 2255 Mot., *Thompson v. United States*, No.

2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 1.) For the reasons stated below, the Court

DENIES the § 2255 Motion.

I.     **PROCEDURAL HISTORY**

    A.     **Criminal Case Number 08-20397**

On December 8, 2009, a federal grand jury returned a four-count indictment charging

that, Thompson, in concert with Morris Akins, (1) on or about May 10, 2007, unlawfully

obstructed, delayed, and affected commerce by robbery of an Easy Way Food Store in Memphis,

Tennessee, in violation of 18 U.S.C. § 1951; (2) knowingly used and carried a firearm during the

robbery in violation of 18 U.S.C. § 924(c); (3) on or about February 17, 2008, killed Michael

Byest with malice aforethought and premeditation to prevent Byest from communicating information related to the robbery to law enforcement or a judge; and (4) from on or about May 10, 2007 to on or about June 11, 2007, conspired to commit robbery of an Easy Way Food Store in Memphis, Tennessee, and Ed's Pawn Shop in Byhalia, Mississippi. (Second Superseding Indictment, *United States v. Akins*, No. 2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 188.) Pursuant to a written plea agreement, Thompson appeared before the Court on January 26, 2012, and entered a guilty plea as to Counts One, Two, and Four. (Min. Entry, *id.*, ECF No. 471; Plea Agreement, *id.*, ECF No. 477.) As a condition of the plea, the United States and Thompson agreed to a specific sentence of thirty years imprisonment pursuant to Rule 11(c)(1)(C) in exchange for the dismissal of Count Three. (Plea Agreement at 1-2, *id.*, ECF No. 477.) The factual basis for the charges is stated in the presentence report ("PSR"):

### **The Offense Conduct**

*Counts One and Two – Easy Way*

6.     According to the investigative file, at approximately 5:50 p.m. on May 10, 2007, the Easy Way Food Store, located at 4599 Elvis Presley Boulevard in Memphis, Tennessee, was robbed at gunpoint. A lone male entered the business, approached employee Andrew E. Edwards, grabbed him by the arm, and held a gun to his face. The suspect, who was wearing a shirt with the Periodic Table of Elements on it, had a revolver in his hand and ordered Edwards to take him to the safe. As they were walking to the safe, another employee, Jeffery Jackson, ran from the business. According to Edwards, the suspect pointed the gun at Jackson but did not fire it. Edwards complied with the suspect's demands, and as he was opening the safe, the suspect told Edwards that he was taking too long, cocked the hammer on the firearm, and fired a shot inside the business. Edwards opened the safe, and the suspect took approximately $150. The suspect then forced Edwards at gunpoint to open two cash registers from which he took an unknown amount of cash. The suspect left the business and fled the area in a white Chevrolet Tahoe. Edwards estimated that $775 was taken during the robbery.

7.     A witness, Michael D. Byest, who was employed at Advance Auto Parts next to the Easy Way, observed the suspects' vehicle and [its] occupants

(two males and one female) when they parked on the lot and as they sped away from the scene after the robbery. He observed the tag number (389LQC) and gave it to Edwards as Edwards called 911. Shortly after a description of the suspects' vehicle was broadcast, it was observed by two officers at 949 East Brooks Road, Suite 2, a known gambling establishment. Additional officers arrived to provide assistance. The officers knocked on the door and were let inside by Willie Mae Stokes, who provided consent for a search of the premises. The officers recovered the shirt worn by the male who entered the Easy Way, as well as a .38 caliber Smith and Wesson revolver, serial number 319778, which was found in the ceiling of the business. Officers also located Morris E. Akins and Michael A. Hill, Akins's son, in the business. The suspects were taken to the Easy Way for a "single shot" identification by the witnesses. Byest identified Akins as the driver of the Tahoe. Hill was released, and Stokes and Akins were transported to the Felony Response Office.

8.      Akins refused to talk to investigators about the robbery but advised officers that he drove the Tahoe and parked it at the Advance Auto Parts next to the Easy Way. He advised that he went to Advance Auto Parts to buy a part but changed his mind and left. Akins denied any involvement in the robbery and said that investigators would have to prove that he was involved because he was not going to say anything else about it. He stated that he thought the police came to his business because he had gambling machines. Akins was charged with Aggravated Robbery and Reckless Endangerment with a Deadly Weapon in booking number 07116578.

9.      On May 10, 2007, crime scene investigators recovered two spent fragments from the floor and a wall at the Easy Way. A DNA sample taken from the shirt recovered from 949 East Brooks Road, Suite 2, matched that of **Michael Thompson**.

10.     Stokes was interviewed by investigators on May 11, 2007. She advised that she worked for Pete Akins a/k/a Morris Akins at 949 East Brooks Road. She also stated that he owned a white and tan Chevrolet Tahoe and that she had not been in the vehicle since Akins purchased it four months earlier. Stokes indicated that she arrived at work at 8:00 a.m. on May 10, 2007, and did not leave the business until the police arrested her. She also stated that she did not know anything about the robbery at the Easy Way. Stokes was subsequently released.

11.     On August 9, 2007, Akins was indicted for Aggravated Robbery and Reckless Endangerment with a Deadly Weapon in case number 07-05578.

12.     On August 24, 2007, investigators spoke with David Carter, the owner of the Easy Way, who advised that a total of $934.94 was taken during the robbery. Investigators also spoke with Edwards, who stated that he had

been suffering from panic/anxiety attacks since the robbery. Workers' Compensation Insurance covered his medical expenses.

13.     During Akins's preliminary hearing in case number 07-05578 on May 31, 2007, Byest identified Akins as the driver of the white Chevrolet Tahoe used during the robbery of the Easy Way.

14.     On February 17, 2008, Joyce Byest, Michael Byest's wife, returned to their residence after going out of town the prior day. As she exited her vehicle, she heard music playing. When Joyce Byest entered their residence, she saw her husband lying face down in a puddle of blood. Blood was around his face and on his back. According to Joyce Byest, she began crying and yelled her husband's name to seek if he was alive, but she did not get a response. She called her father and told him that she thought her husband shot himself. Joyce Byest then called 911 to let them know what she thought had happened and where she lived. She stayed outside the residence until the police and fire trucks arrived. Joyce Byest advised that it appeared as if her husband had cleaned the house and that there had not been a disturbance.

15.     The investigation revealed that Byest had been shot three times. There were no signs of forced entry or any struggle in the house.

16.     According to the Report of Autopsy Examination, Michael Byest's cause of death was multiple gunshot wounds.

. . . .

17.     In November 2008, investigators received information that Morris Akins and **Michael Thompson** were responsible for Byest's death because Byest was able to identify Akins as one of the subjects who robbed the Easy Way. Sometime after Akins's preliminary hearing, he told **Thompson** that they needed to kill Byest. They watched Byest for several days before the murder. On February 17, 2008, **Thompson** waited at Byest's residence for him to return home. When Byest arrived, **Thompson** shot him three times.

*Count Four – Ed's Pawn Shop*

18.     On June 11, 2007, two males knocked on the back door of the residence belonging to Eddie Archer, located on Highway 309 South in Marshall County, Mississippi. Archer was also the owner of a pawn shop located close to his residence. When Archer's son, Andrew Archer, 10, opened the door, the suspects came in the residence, looking for Archer. They were wearing stocking masks over their faces and holding revolvers. One of the suspects asked Andrew Archer if he and another boy, Steven Wayne

Howell, 9, Archer's nephew, were in the back of the house playing video games. Andrew Archer responded that they were, and the suspect told him that they were going to play a "funner" game. The suspect put on plastic gloves and then took the boys to the back of the residence and taped their hands and feet together with duct tape. Their hands were taped behind their backs. The other suspect went into the bathroom, made Archer, who had been taking a bath or shower, lie on the ground, and asked him where the money was. The suspect told Archer that he would kill him if he did not do as he was told. He stated that the suspects used "rough" language and cussed. According to Archer, the suspects were talking to a third suspect using a hand-held radio while they were in his residence. At one point, the suspects made Archer get on the radio and someone told him that he had been watching him for three weeks and knew every move he made and everything he did. He was also told, "If you made one wrong move, we are going to blow your fucking brains out." The suspect on the radio told him to go open the safe for the other suspects and do exactly what they said. He also told Archer that he would be back to finish the job if Archer called the police. The suspects told Archer that they would take the boys behind the house and kill them if he did not give them the money.

19.     One of the suspects escorted Archer to the pawn shop, where he unlocked the door and put in the alarm code. They then returned to Archer's residence, and the suspect told Archer to sit on the couch and not move. The suspect took a pillow case from a bed and wrapped it around his handgun. Archer told the suspects that he thought he put in the wrong code for the alarm and that he was scared it would go off if they opened the door. At that time, the suspects got nervous and walked the boys into the living room. They told Andrew Archer that if he ever wanted to see his father alive again, his father had better do exactly what he was told or they would cut their throats. One of the suspects escorted Archer to the pawn shop again, and Archer reset the alarm. After he unlocked the safe, Archer was escorted back to his residence. When the suspect who had stayed inside his residence walked onto the back porch, the suspect holding the gun on Archer looked at the other suspect, so Archer ran toward A-1 Grocery Store, which was located across from his residence. He yelled at the people in the parking lot to call 911 because he was being robbed. Archer returned to his residence where the two boys were still restrained with duct tape and crying. The suspects took an undetermined amount of cash and a cell phone from Archer.

20.     Archer advised investigators that he had seen a male who was not from the area "hanging out" at the grocery store across from his residence. Investigators later learned that this male had a radio similar to the one the suspects used during the robbery. Video surveillance from the grocery store revealed that the male was in the parking lot during the robbery

talking on a hand-held radio. The male also used the pay telephone several times. A representative from Casco Pay Phone service obtained the records for the pay phone on June 11, 2007, and investigators determined that Morris Akins's number was called from the phone. Archer also advised investigators that an older model red Chevrolet truck had been parked in his driveway during the robbery. He stated that he ran from the suspects because he thought they would kill him when they got back to his residence. Archer also indicated that his son told him that the other suspect put a pillow over the boys'[] heads and wrapped a pillowcase around his own hand.

. . . .

22.     Investigators were unable to obtain additional information about the case and requested media coverage for a Crimestoppers reward. On April 14, 2008, investigators received information that **Michael Thompson**, Morris Akins, and Terrance Vaughn were responsible for the home invasion and robbery of the pawn shop. On December 9, 2008, Eddie Archer identified **Thompson** as one of the suspects from a photo lineup. On April 14, 2009, he identified Terrance Vaughn as one of the suspects from a photo lineup.

23.     The investigation revealed that Akins heard that Eddie Archer had a lot [of] money, so he stationed Samuel Lee Dickerson in the area to gather information about Eddie Archer's schedule. Dickerson went back and forth between Marshall County and Memphis for a couple of weeks. On the day of the robbery, Dickerson told Akins that it was a good day because Archer's wife was gone, but his son was with him. During the robbery, Dickerson served as a lookout from the grocery store across the street while **Thompson** and Vaughn went into the residence and Akins and another male, Michael Hill, waited in a nearby town. After the robbery, Dickerson was left in Mississippi.

24.     At approximately 3:12 a.m. on March 11, 2008, Vaughn was found near 20 East McKellar in Memphis, having been shot three times. Three spent .380 shell casings were found in [the] area. Vaughn later died as a result of the gunshot wounds. The investigation into this murder is still ongoing.

. . . .

### Adjustment for Acceptance of Responsibility

29.     During the interview with the probation officer, the defendant apologized for his actions and stated that he should have known better. He indicated that it might not have happened if he had been functioning properly on his medication and that he plans to change his life if he gets out of prison. The defendant also provided the following statement:

We was riding in a truck and went inside an Easy Way and robbed the grocery store. It was just me and Morris Akins. He parked the truck, and I went inside and robbed the store. It was wrong. I really regret that it happened.

We also conspired to rob a pawn shop in Mississippi. It was a misfortune that happened. I apologized in Court and regret it.

(PSR ¶¶ 6-25, 29.)

At a hearing on May 2, 2012, pursuant to the parties' Rule 11(c)(1)(C) agreement, the Court sentenced Thompson to a total term of imprisonment of thirty (30) years, to be followed by a five-year period of supervised release. (Min. Entry, *United States v. Akins*, No. 2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 507.)[1] Judgment was entered on May 2, 2012. (J. in a Criminal Case, *id.*, ECF No. 508.)

---

[1] The 2011 edition of the *Guidelines Manual* was used to calculate Thompson's sentencing range. (PSR ¶ 30.) On Count One, pursuant to U.S.S.G. § 2A1.1(a), the base offense level for violations of 18 U.S.C. § 1951 that result in the killing of a victim under circumstances constituting murder under 18 U.S.C. § 1111 is 43. (*Id.* ¶ 32.) Thompson received a two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1, resulting in a subtotal offense level of 45. (*Id.* ¶¶ 36, 37.) On Count Two, pursuant to U.S.S.G. § 2K2.4(b), the guideline sentence is the minimum term of imprisonment required by statute, consecutive to any other sentence imposed. (*Id.* ¶ 38.) In Thompson's case, this minimum is ten (10) years. (*Id.*; *see also* 18 U.S.C. § 924(c).) On Count Four, pursuant to § 2X1.1(a), the base offense level is based on the base offense level for the substantive offense plus any adjustments for any intended offense conduct that can be established with reasonable certainty. (PSR ¶ 39.) Accordingly, the base offense level of 20 was calculated using the § 2B3.1(a) guideline for Robbery. (*Id.*) Thompson received a six-level enhancement for using, but not discharging, a firearm, U.S.S.G. § 2B3.1(b)(2)(B); a two-level enhancement for physically restraining a person to facilitate the offense or escape, U.S.S.G. § 2B3.1(b)(4)(B); and a two-level enhancement because he knew or should have known that the offense involved a vulnerable victim, U.S.S.G. § 3A1.1(b)(1). (*Id.* ¶¶ 40, 41, 42.) Thus, the subtotal offense level was 30. (*Id.* ¶ 45.) The combined total offense level of 45 was determined using § 3D1.4 of the United States Sentencing Guidelines ("U.S.S.G.") because the counts of conviction do not involve the same harm. (*Id.* ¶¶ 31, 46.) Thompson received a three-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1, resulting in a total offense level of 42. (*Id.* ¶¶ 47, 50.) Given his criminal history category of IV, the guideline sentencing range was 360 months to life, plus 10 years to be served consecutively on Count Two. (*2011 Guidelines Manual*, Ch. 5, part A – Sentencing Table; PSR ¶ 118.) On Counts One and Four, the restricted guideline range for each count was 240 months. (PSR ¶ 118.)

**B.      Case Number 13-2071**

On February 1, 2013, Thompson filed a *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). (§ 2255 Mot., *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 1.)  This motion presents the following issue: "Whether Counsel's Failure to File an Appeal, after being instructed to do so, entitles Petitioner to collateral relief."  (*Id.* at 5.)  Thompson asserts that "[i]mmediately after the judge pronounced [the] sentence, I instructed my attorney to appeal my sentence, and he failed to do so.  Also, on May 4, 2012, I wrote my attorney Jeff C. Woods and told him to appeal."  (*Id.*)  Plaintiff attached to his § 2255 Motion a copy of the letter he asserts he sent to his attorney.  (Letter to Mr. Woods, *id.*, ECF No. 1-3.)

On April 11, 2013, Thompson filed a motion to amend his § 2255 motion to include ineffective assistance of counsel as to an offered plea agreement for twenty-three (23) years imprisonment and as to failing to assert a known defense and preserve objections under *Alleyne v. United States*.  (Mot. to Amend, *id.*, ECF No. 2.)  On August 1, 2013, the Court issued an order granting Thompson's motion to amend and directing the Government to respond.  (Order, *id.*, ECF No. 3.)  On August 26, 2013, the Government filed a motion to release trial counsel from attorney-client privilege.  (Mot. to Waive Privilege, *id.*, ECF No. 4.)  The Court granted the motion on August 27, 2013.  (Order, *id.*, ECF No. 5.)  The Government filed its Answer on October 4, 2013.  (Answer, *id.*, ECF No. 7.)  The Government's Answer includes affidavits of Petitioner's trial counsel, Jeff C. Woods, Esq., and Justin A. Gee, Esq., which assert that they were unable to appeal Thompson's sentence because Thompson had waived the right to appeal; that the plea offer of twenty-three years would not have been approved by the Government; and that *Alleyne v. United States* had not yet been decided by the Supreme Court at the time of

Thompson's plea or sentencing.  (*See* Woods Aff., *id.*, ECF No. 7-1; Gee Aff., *id.*, ECF No. 7-2.)

Thompson filed a Reply on November 1, 2013.  (Reply, *id.*, ECF No. 9.)

On March 16, 2016, the Court held an evidentiary hearing regarding Thompson's initial claim of ineffective assistance of counsel as to the failure to appeal Thompson's sentence despite Thompson's assertions that he directed his counsel to do so.  (Min. Entry, *id.*, ECF No. 20.)

## II.    THE LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

"[A] § 2255 motion 'is not a substitute for a direct appeal.'" *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013) (quoting *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003)).  "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996).

Even constitutional claims that could have been raised on direct appeal, but were not, are barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 699-700 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). Where the judge considering the § 2255 motion also presided over the criminal case, the

judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). The movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

"If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668 . . . (1984)." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.

> A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

*Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citations omitted). To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[2] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a

---

[2] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . ." *Strickland*, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

trial whose result is reliable.'" *Richter*, 562 U.S. at 104 (citations omitted); *see also id.* at 111-12

("In assessing prejudice under *Strickland*, the question is not whether a court can be certain

counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt

might have been established if counsel acted differently. . . . The likelihood of a different result

must be substantial, not just conceivable." (citations omitted)); *Wong v. Belmontes*, 558 U.S. 15,

27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable

outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to

show a 'reasonable probability' that the result would have been different.").

The two-part test stated in *Strickland* applies to challenges to guilty pleas based on the

ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 57–58 (1985). "Where, as here,

a defendant is represented by counsel during the plea process and enters his plea upon the advice

of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the

range of competence demanded of attorneys in criminal cases.'" *Id.* at 56 (quoting *McMann v.*

*Richardson*, 397 U.S. 759, 771 (1970)). "[T]o satisfy the 'prejudice' requirement, the defendant

must show that there is a reasonable probability that, but for counsel's errors," the outcome of

the plea process would have been different. *Id.* at 59; *see also Padilla v. Kentucky*, 559 U.S.

356, 372 (2010) ("[T]o obtain relief on this type of claim, a petitioner must convince the court

that a decision to reject the plea bargain would have been rational under the circumstances.").

## III. ANALYSIS

In his initial § 2255 Motion and the amendment to the § 2255 Motion, Thompson raises

three ineffective assistance of counsel claims. Thompson asserts that his counsel was ineffective

for (1) failing to file a notice of appeal despite being told by Thompson to do so (§ 2255 Motion

at 5, *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 1); (2)

failing to notify Thompson of a plea offer of twenty-three years imprisonment (Mot. to Amend at 1-2, *id.*, ECF No. 2); and (3) failing to assert a defense under *Alleyne v. United States* (*id.* at 2-3). The Court addresses each claim below.

### A. Failure to File a Notice of Appeal

Thompson alleges that his trial counsel provided ineffective assistance by failing to file a notice of appeal even though Thompson had instructed attorney Jeff C. Woods to do so both orally and in writing. (§ 2255 Motion at 5, *id.*, ECF No. 1.) The Sixth Circuit has held that "even when a defendant waives all or most of his right to appeal, an attorney who fails to file an appeal that a criminal defendant explicitly requests has, as a matter of law, provided ineffective assistance of counsel that entitles the defendant to relief in the form of a delayed appeal." *Campbell v. United States*, 686 F.3d 353, 360 (6th Cir. 2012). An evidentiary hearing was necessary to determine whether Thompson actually affirmatively expressed to counsel his desire for an appeal. *See id.* at 360 ("the resolution of this factual issue is pivotal to [movant's] claim for relief" and requires a hearing).

Thompson asserts that "[i]mmediately after the judge pronounced [his] sentence," he requested that Woods file an appeal. (Thompson Decl., *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 1-2 ¶ 2.) He also asserts that he wrote to Woods on May 4, 2012, "informing him to appeal the sentence." (*Id.* ¶ 3.) Thompson filed a letter to Woods, dated May 4, 2012, that reads: "Mr. Woods[,] I'm writting [sic] you about appealing my sentence. I don't feel like I was treated fair . . . . Remember I told you at sentencing about appealing this judg[]ment so I need your help with the appeal." (Letter to Mr. Woods, *id.*, ECF No. 1-3.) At the evidentiary hearing, Thompson gave conflicting answers as to when he asked Woods to file an appeal and from where he had mailed his letter seeking Woods

to appeal (*see* Evidentiary Hr'g Tr. 21:10-22:22, 23:15-19),[3] but affirmed that the statements in his declaration were true (*id.* at 27:12-28:20). Thompson also affirmed that the letter filed was written by him, in his handwriting (*id.* at 25:3-17), and was mailed on May 4, 2012 (*id.* at 38:9-17).

In their affidavits, both Woods and Gee assert that "counsel was unable to appeal [Thompson's] sentence imposed as [Thompson] agreed to [an] appeal waiver and any appeal filed by counsel would have been frivolous." (Woods Aff. at 2, *id.*, ECF No. 7-1; Gee Aff. at 2, *id.*, ECF No. 7-2.)[4] Thompson's plea agreement states that Thompson "knowingly and voluntarily waives his right to appeal any sentence imposed by the Court pursuant to this agreement. The waiver in this paragraph does not apply to claims relating to prosecutorial misconduct and ineffective assistance of counsel." (Plea Agreement, *United States v. Akins*, No.

---

[3] During both direct and cross-examination, Thompson stated that he asked Woods to appeal his sentence at the "PSI hearing" before sentencing, where Thompson, his counsel, and a probation officer were present. (*See* Evidentiary Hr'g Tr. 21:16-22:6, 28:21-29:17.) While this assertion in court and Thompson's assertion that he told Woods to appeal after the Court sentenced him are not mutually exclusive, prior to the evidentiary hearing, Thompson had never asserted that he had asked his attorneys at any time before his sentencing hearing to file an appeal.

[4] If Thompson's assertions that he requested that his attorneys file an appeal are found credible, the waiver issue is irrelevant. Regardless of the waiver, "a defendant is entitled to counsel who will follow through on express instructions to proceed with an appeal, *no matter what the ultimate odds of success.*" *Campbell*, 686 F.3d at 360 (emphasis added). Although the *Campbell* decision was not issued until July 19, 2012, over two months after Thompson's sentencing hearing, there exists earlier Supreme Court case law from which *Campbell* logically follows. In *Rodriquez v. United States*, 395 U.S. 327, 330 (1969), the Supreme Court held that the failure of defense counsel to file a notice of appeal despite being instructed to do so by his client constitutes *per se* ineffective assistance of counsel, without regard to the legal merit of any issues that might be raised on direct appeal. *See also Roe v. Flores–Ortega*, 528 U.S. 470, 477 (2000) ("We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." (citation omitted)).

2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 477.)  At the sentencing hearing, the Court

reminded Thompson that although he had waived his right to appeal, he still had the right to

appeal if he believed there was a defect in the proceedings to which the waiver would not apply.

(Sentencing Hr'g Tr. 36:6-16, *id.*, ECF No. 512.)  The Court then asked, "Is it still your intention

to waive your right to appeal in this case?," to which Thompson replied, "Yes, Your Honor."

(*Id.* at 37:10-12.)  At the evidentiary hearing, neither Woods nor Gee could recall whether or not

Thompson requested an appeal following Thompson's sentencing.  (Evidentiary Hr'g Tr.

41:23-42:8, 57:8-13.)  Gee stated that he likely would have recalled such a request.  (*Id.* at

57:14-19.)  Neither Woods nor Gee could recall whether a letter was later received from

Thompson regarding an appeal of his sentence, and neither could find a copy of the letter when

searching through their personal files in preparation for the evidentiary hearing.  (*Id.* at

42:14-43:14, 57:20-22, 58:7-59:4, 59:23-60:4.)

     The Court finds that Thompson has not met his burden of proving his entitlement to relief

by a preponderance of the evidence.  First, Thompson asserts that he asked Woods to appeal, but

neither Woods nor co-counsel Gee can recall whether Thompson did so.  Second, Thompson

provides what appears to be a copy of the letter[5] he sent to Woods on May 4, 2012, after the

sentencing hearing, asking Woods to appeal.  Woods and Gee testified that they could not recall

receiving Thompson's letter and that no such letter was found in what was left of their files from

---

[5] The Court attempted to determine the authenticity of the letter, which was filed in the
instant case on February 1, 2013, as part of Thompson's § 2255 Motion.  (*See* Letter to Mr.
Woods, *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 1-3.)
Per a 2006 memorandum issued by the Administrative Office of the United States Courts, paper
documents may be disposed of immediately after they are scanned into the United States Courts
Case Management/Electronic Case File (CM/ECF) system.  Memorandum from the Admin.
Office of the U.S. Courts to Chief Judges, U.S. Courts; Dist. Court Execs.; and Clerks, U.S.
Courts (May 24, 2006).  The original documents from Thompson's § 2255 Motion are no longer
available, as over three years have passed since their filing.

Thompson's case. The Court finds that both parties present plausible accounts as to whether Thompson asked his attorneys to appeal, and thus, the resolution of the issue turns on the credibility of the witnesses. *See, e.g.*, *Galvan-Palomino v. United States*, Civil Action No. SA-05-CA-1047 FB (NN), Criminal Action No. SA-04-CR-554 FB, 2007 WL 596578, at *1 (W.D. Tex. Feb. 20, 2007). In the instant case, Thompson has a known criminal record (*see, e.g.*, Evidentiary Hr'g Tr. 35:12-37:7), which is one factor for impeachment of his credibility as a witness. *See Vasquez v. Jones*, 496 F.3d 564, 571 (6th Cir. 2007) ("[T]he Confrontation Clause affords the right to impeach a witness with his criminal record . . . . [and] [i]mpeachment with prior crimes is . . . . a prototypical form of cross-examination, even if it goes only to the witness's credibility." (citations omitted)). In addition, Thompson failed to provide any corroborating documentation as to whether the letter asking Woods to appeal was actually mailed and, if so, when it was mailed or when it was received. Thus, Thompson's assertions are less credible than those of Woods and Gee. Based on the Court's consideration of the relative credibility of the witnesses, the Court finds that Thompson has failed to meet his burden of proving *per se* ineffective assistance of counsel. Thompson has not established by a preponderance of the evidence that he asked his attorneys to appeal and they did not do so. Accordingly, Thompson is not entitled to relief on this ground.

**B.      Failure to Relay Plea Offer**

Thompson asserts that "a plea was offered to the defendant for twenty-three (23) years total imprisonment. Counsel failed to put forth to the defendant the government[']s offer." (Mot. to Amend at 1, *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 2.) The Government argues that the offer of twenty-three years was not a "formal offer," thus it was not required to be communicated to Thompson. (Answer at 9, *id.*, ECF No. 7

(citing *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012)).)  Therefore, counsel's conduct was not below an objective standard of reasonableness.  The Government argues further that, even if Thompson's counsel had disregarded their duty to relay the plea offer, the second prong of *Strickland* would not be met because there is no reasonable probability that the Court would have accepted a twenty-three-year sentence when it had already stated its reservations about the actual thirty-year sentence.  (*Id.* at 10.)

Thompson's claim does not satisfy the two-part test of *Strickland*.  There is nothing in the record to show that a formal offer of a plea agreement of twenty-three years was made by the Government.  At the evidentiary hearing, both Woods and Gee testified that the United States Attorney would not agree to a twenty-three-year deal.  (Evidentiary Hr'g Tr. 43:18-25, 64:13-25).  As such, Thompson's counsel did not have a formal offer to relay to Thompson.  *See Frye*, 132 S. Ct. at 1408 ("defense counsel has the duty to communicate *formal offers from the prosecution* to accept a plea on terms and conditions that may be favorable to the accused" (emphasis added)).

Further, the Court would likely not have accepted[6] such a plea agreement even if both parties had agreed to it, as the Rule 11(c)(1)(C) agreed-upon thirty-year sentence was already ten years less than the minimum sentence that Thompson was likely to have received.  Thompson was sentenced to "20 years as to Counts 1 and 4, and 10 years consecutive as to Count 2 to be served to produce a total term of 30 years."  (Sentencing Hr'g Tr. 32:8-10, *United States v.*

---

[6] Prior to sentencing, on February 1, 2012, a status conference was held, during which the Court expressed reservations about accepting the Plea Agreement and the specific sentence of thirty years imprisonment.  (*See, e.g.*, Status Conference Tr. 23:21-22; 29:2-8, *United States v. Akins*, No. 2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 492.)  Specifically, the Court expressed concern about the dismissal of Count Three, noting that the aforementioned count involved the murder of a federal witness and required a mandatory life sentence.  (*Id.* at 21:13-23:23.)  The Court ultimately decided to wait and review the PSR prior to making any decision about the Rule 11(c)(1)(C) Plea Agreement.  (*Id.* at 32:10-33:14.)

*Akins*, No. 2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 512.) The Court noted that "the sentence is below the guideline range . . . [of] 360 months, which is 30 years[,] to life."[7] (*Id.* at 29:9-11.)

Thus, Thompson cannot demonstrate that counsel was objectively unreasonable, because counsel could not have presented an offer that did not exist, and Thompson cannot demonstrate a substantial likelihood that the outcome of his sentence would have been different even had such a deal existed and been presented to him, because it is unlikely that the Court would have accepted a sentence of only twenty-three years. Accordingly, Thompson is not entitled to relief on this ground.

### C.     Failure to Preserve Objections

Thompson asserts that, post-*Alleyne*, a judge is precluded "from finding facts to impose a mandatory minimum sentence" and therefore, Thompson was prejudiced in receiving a longer sentence by his counsel's failure to assert a defense under *Alleyne*. (ECF No. 2 at 2-3.) In *Alleyne*, the Supreme Court held that under 18 U.S.C. § 924(c), the United States must prove beyond a reasonable doubt that a defendant "discharged" a firearm in order to obtain a consecutive, mandatory-minimum sentence of ten years imprisonment. *See Alleyne*, 133 S. Ct. 2151, 2155 (2013). ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."). In a guilty plea context, this can be satisfied if the defendant voluntarily admits under oath to discharging the firearm at issue. *United States v. Yancy*, 725 F.3d 596, 601-603 (6th Cir. 2013).

---

[7] The "360 months" of the guidelines range refers to the minimum sentence before the addition of ten consecutive years on Count Two, not to the total sentence. (*See* PSR ¶ 118.) Thus, Thompson's actual sentence was at least ten years less than the minimum sentence recommended under the sentencing guidelines.

The Government argues that Thompson's consecutive mandatory minimum sentence of ten years for discharging his firearm during the Easy Way robbery was not the ultimate sentence in light of the plea agreement under Rule 11(c)(1)(C). (Answer at 10-11, *Thompson v. United States*, No. 2:13-cv-02071-JPM-dkv (W.D. Tenn.), ECF No. 7.) The Government also argues that even if Thompson's sentence had been pursuant to the consecutive mandatory minimum, Thompson admitted under oath to discharging his firearm, which indicates that it was objectively reasonable for Thompson's counsel not to object to the sentence. (*Id.* at 11.)

The Court finds that Thompson's claim is not relevant to his actual sentence. Thompson's ultimate sentence was not affected by the imposition of a mandatory minimum; rather, his sentence was the result of a plea agreement. (*See* Plea Agreement, *United States v. Akins*, No. 2:08-cr-20397-JPM-dkv-2 (W.D. Tenn.), ECF No. 477.) Further, even if a mandatory minimum had been imposed for Thompson's sentence, Thompson's claim under *Alleyne* does not satisfy the two-part *Strickland* test. Counsel was not objectively unreasonable in failing to preserve objections under *Alleyne* because Thompson had already admitted to facts that would have increased his sentence. During the evidentiary hearing, Thompson also conceded that it was "in the records" that he "fired a shot during [the Easy Way] robbery." (Evidentiary Hr'g Tr. 35:6-11.) Accordingly, Thompson is not entitled to relief on this ground.

Because Thompson is not entitled to relief on any of the ineffective assistance of counsel issues raised in his § 2255 Motion and subsequent amendment, the Court DENIES the § 2255 Motion. Judgment shall be entered for the Government.

## IV. APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if

the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate. The COA must indicate the specific issue(s) that satisfy the required showing. 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the movant demonstrates "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337 ("[A] court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief."); *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Miller-El*, 537 U.S. at 337 ("Our holding should not be misconstrued as directing that a COA always must issue.").

There can be no question that the issues raised in Thompson's § 2255 Motion are meritless for the reasons previously stated. Because any appeal by Thompson on the issues raised in his § 2255 Motion does not merit review, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals brought under § 2255. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Id.* at 952. Rule 24(a)

provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). Rule 24(a) also provides, however, that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(3)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[8]

**IT IS SO ORDERED**, this 30th day of March, 2016.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

---

[8] If Thompson files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.